IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CT-3092-FL

MICHAEL DWAYNE ROGERS,    )
            )
        Plaintiff,    )
            )
    v.        )
            )
WENDELL B. JACKSON, GEORGE T.    )        ORDER
SOLOMON, PATSY CHAVIS,    )
KRISTIE STANBACK, FAY    )
LASSITER, LARRY DUNSTON,    )
CRYSTAL ATKINSON, and JAMES    )
McPHERSON,    )
            )
        Defendants.

This matter is before the court on defendants' motion for summary judgment (DE 41),

defendants' motion to seal (DE 48), and plaintiff's motion to amend (DE 55). The issues raised have

been fully briefed and are ripe for adjudication. For the following reasons, this court grants

defendants' motions and denies plaintiff's motion.

## STATEMENT OF THE CASE

On April 16, 2015, plaintiff, a state inmate, filed this civil rights action, pro se, pursuant to

42 U.S.C. § 1983 on the basis of the Religious Land Use of Institutionalized Persons Act of 2000

("RLUIPA"), 42 U.S.C. §§ 2000cc, et seq. and the First and Fourteenth Amendments to the U.S.

Constitution. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive

damages. Plaintiff filed a verified complaint[1] naming the following as defendants: Wendell B.

---

[1] This court will liberally construe plaintiff's complaint as a verified complaint. See Williams v. Griffin,
952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary
judgment purposes, when the allegations contained therein are based on personal knowledge.").

Jackson ("Jackson"), George T. Solomon ("Solomon"), Patsy Chavis ("Chavis"), Kristie Stanback ("Stanback"), Fay Lassiter ("Lassiter"), Larry Dunston ("Dunston"), Crystal Atkinson ("Atkinson"), and James McPherson ("McPherson").  (See Compl. (DE 1) ¶¶ 4-10).

On September 29, 2015, this court conducted a frivolity review pursuant to 28 U.S.C. § 1915. This court found that it did not clearly appear from the face of the complaint that plaintiff was not entitled to relief, and the matter was allowed to proceed.  On March 4, 2016, plaintiff filed a motion to appoint counsel, which was denied.  On March 9, 2016, a case management order was entered.

On October 25, 2016, defendants filed the instant motion for summary judgment, a memorandum in support (DE 42), a statement of material facts (DE 43), an appendix to the statement of material facts (DE 44), a proposed sealed exhibit (DE 47), and a motion to seal (DE 48).  The appendix to the statement of material facts (DE 44) includes the following: an article from the Southern Poverty Law Center (DE 44-1), defendant Dunston's affidavit (DE 44-2), defendant Lassister's affidavit (DE 44-3), Betty Brown's ("Brown") affidavit (DE 44-4), and two unpublished cases (DE 44-5, 44-6).

On November 14, 2016, plaintiff filed a memorandum in opposition (DE 50), a statement of material facts (DE 51), and an appendix to the statement of material facts (DE 52).  On March 22, 2017, plaintiff filed a motion to amend.

## STATEMENT OF THE FACTS

Except as otherwise noted below, the undisputed facts are as follows:  plaintiff is a prisoner of the State of North Carolina in the custody of the North Carolina Department of Public Safety ("NCDPS").  (See Compl. (DE 1) ¶ 3).  At the time he initiated this action, plaintiff was being housed at Tabor Correctional Institution ("C.I.") in Tabor City, North Carolina.  (See id.)

On March 3, 1998, defendant Jackson, formerly a lieutenant at Foothills C.I., who retired in 2000, interviewed plaintiff regarding his possible involvement as a member of a Security Threat Group ("STG"). (See Dunston Aff. (DE 44-2) Ex. D). In connection with this interview, defendant Jackson prepared a memorandum to Toney Stamey, Corrections Administrator I at Foothills C.I. (Id.) The memo stated the following: plaintiff admitted he was a Muslim who believed in the teachings of Clarence the 13X, plaintiff possessed "Five Percenter"[2] literature; plaintiff admitted he was a Five Percenter; plaintiff had received 19 prison infractions[3] since his admission to prison; and plaintiff explained that he was being held as a slave, white people are devils, he would not change his beliefs, and he would be a martyr for his people. (Id.) Defendant Jackson recommended that plaintiff be validated as a Level III STG member. (Id.)

On March 18, 1998, plaintiff was "validated" by defendant Jackson as a STG[4] member of

---

[2] Clarence 13X is the founder of the "Five Percenters." (See Brown Aff. (DE 47-5) Ex. B; Pl.'s Stat. Mat. Facts (DE 51) ¶ 36). The "Five Percenters" have been linked to "The Bloods," or the United Blood Nation, a more well-known gang. (See Dunston Aff. (DE 44-2) ¶ 17). Defendants represent that since the mid-1990's the Five Percenters have been a violent, gang-associated group. (See id. ¶ 14). The members have a history of violence against other inmates and correctional staff. (See id. ¶ 14). The Five Percenters are a radically racist group that uses violence to support its views. (See id. ¶ 15). The group's literature promotes inflammatory racist beliefs that could be dangerous in a prison atmosphere. (Id.) Brown, the Director of Chaplaincy Services, states that to her knowledge the Five Percenters is a banned organization, both in the Federal Bureau of Prisons and many state prison systems. (See Brown Aff. (DE 44-4) ¶¶ 4, 12).
    Plaintiff alleges that he has been falsely designated as a member of the Five Percenters. (See Compl. (DE 1) ¶¶ 25, 54). Plaintiff requests that this court order that the Five Percenters be removed from NCDPS's list of STGs. (See id. ¶ 54).

[3] Plaintiff alleges that he has never received an infraction for gang-related activity. (See Pl.'s Stat. Mat. Facts (DE 51) ¶ 17). Similarly, plaintiff alleges that he has never received an infraction for engaging in violent group activity. (See id. ¶ 27).

[4] Defendants represent that STGs are identified as security threats only after extensive research and documentation of member behavior by facility intelligence officers in the field. (See Dunston. Aff. (DE44-2) ¶ 5). Facility intelligence officers are trained in gathering intelligence related to gang activity. (See id.) Intelligence related to gang activity is reviewed by several prison management levels and ultimately approved by the Director of Prisons. (See id.)

the group Nation of Gods and Earths, widely known as "Five Percenters."[5] (See Compl. (DE 1) ¶ 11). The "validation" of a STG member takes place through a point system and requires evidence of participation in several different categories, including identifying tattoos, disciplinary infractions related to gang activity, or the use of gang "symbols." (See Dunston Aff. (DE 44-2) ¶ 7.) When an inmate self-admits participation in a STG it can be sufficient for the inmate to be validated. (Id.) The designation of levels I, II, or III is assigned to an inmate after an assessment of that inmate's relationship to the STG, in addition to his behavior while incarcerated. (Id.) Validation status is reviewed bi-annually at Levels I and II and once per year at Level III. (Id. ¶ 8). The purpose of the review is to assess behavior, and the reviews are completely individualized. (Id.) In fact, at each review, inmates are afforded the opportunity to be heard or present evidence regarding their validation status. (Id.) Inmates may also request a review of their validation status. (Id.)

Inmates are identified as members of a STG through an extensive process. (See Dunston Aff. (DE 44-2) ¶ 6). Initially, an investigation is done at the facility level by a facility intelligence officer. (Id.) The results are reviewed by the facility head and then the division official for that facility. (Id.) Inmates are "validated" at three different levels, and Level III is the "highest" level. (Id.) Before an inmate is "validated," he or she will receive notification of the validation and an opportunity to present their own information or otherwise dispute the "validation." (Id.)

Plaintiff asserts that although he was validated as the member of a STG, he is a follower of the religious community Nation of Islam ("NOI"). (See Compl. (DE 1) ¶ 25). Both NOI and Five

---

[5] According to defendants, Charles K. Stewart, Chief of Security, decided to validate plaintiff based on the recommendation of defendant Jackson and the approval of Administrator Stamey. (See Dunston Aff. (DE44-2) Ex. D).

Percenters study <u>The Supreme Wisdom Lessons</u>[6] (<u>see</u> <u>id.</u> ¶ 26), and both groups are legally recognized outside NCDPS (<u>see</u> <u>id.</u> ¶ 27).  Plaintiff alleges that based on his STG designation, he is subjected to the following:  a monthly urinalysis test; a maximum of two telephone calls per month; restricted to non-contact visits only from immediate family; regular, random searches, including strip searches; and outgoing mail is screened.[7]  (<u>See</u> <u>id.</u> ¶¶ 12-16).

Around October 2006, defendant Dunston "shipped" plaintiff to the Security Threat Group Management Unit ("STGMU")[8] at Foothills C.I.  (<u>See</u> <u>id.</u> ¶ 17).  Plaintiff spent the first 72 hours in segregation.  (<u>See</u> <u>id.</u> ¶ 18).  Following his time in segregation, plaintiff was placed in "phase one" of the program.  (<u>See</u> <u>id.</u> ¶ 19).  Each phase is 90 days, and there are three phases.  (<u>See</u> Compl. (DE 1) ¶ 20).  Plaintiff spent most of each day in his cell.  (<u>See</u> <u>id.</u> ¶ 21).  For the first six months, recreation was in a cage with other inmates who had been identified as gang members in his phase. (<u>See</u> <u>id.</u> ¶ 22).  On October 1, 2007, plaintiff completed STGMU.[9]  (<u>See</u> <u>id.</u> ¶ 23).

In January 2008, plaintiff's STG Validation Level was reduced from III to II.  (<u>See</u> Dunston Aff. (DE 44-2) ¶ 26).  Plaintiff's Level was increased back to III after he was convicted of assaulting

---

[6] Defendants represent that "The Supreme Lessons" by Master Fard Muhammad is used by NOI and Five Percenters, but it is not accepted by the Islamic faith.  (<u>See</u> Lassiter Aff. (DE44-3) ¶ 10; (DE 47-4) Ex. E).

[7] Defendants claim that validation levels, in isolation, do not control an inmate's conditions of confinement or custody control status.  (<u>See</u> Dunston Aff. (DE 44-2) ¶ 9).

[8] According to defendants, STGMU is offered to STG members by NCDPS to equip the inmates with skills to assist them in efforts to disassociate with gangs.  (<u>See</u> Dunston Aff. (DE44-2) ¶ 11).  Following completion of the program, an inmate's level may be reduced if several months of observation reveals that he is no longer committing disciplinary infractions or other gang-related behavior.  (<u>Id.</u> ¶ 12).

[9] Plaintiff explains that he was informed that in order to get removed from the STG designation he had to complete the program.  (<u>See</u> <u>id.</u> ¶ 24).

an inmate with a weapon.  (See id. ¶ 26).  Since January 2009, plaintiff has remained on Level III.[10]

(See id. ¶ 26, Exs. E, F).

On April 27, 2012, defendant Stanback disapproved of certain issues of Volume 31 of "The

Final Call," which is a NOI religious periodical.  (See Compl. (DE 1) ¶ 35).  On May 30, 2012,

defendant Lassiter "approve[d] the disapproval" of certain issues of "The Final Call."[11]  (See id.

¶ 36).  On June 8 , 2012, and June 11, 2012, certain issues of "The Final Call" were banned without

review.[12]  (See id. ¶¶ 37-38).  On July 2, 2014, certain issues of "The Final Call" were censored by

defendant Chavis.  (See id. ¶ 48.5).

Defendants explain that in order to maintain safety and security, materials received by

inmates are examined to determine whether the material contains gang-related information, racist

information, or violence.  (See Lassiter Aff. (DE 44-3) ¶ 5, Ex. A).  Because the prohibited materials

---

[10] Defendants explain that plaintiff has been maintained on Level III because he committed the following infractions since 2009: substance possession on January 26, 2010; possessing contraband on March 16, 2010; fighting on March 20, 2010; a verbal threat on April 6, 2010; disobeying an order on April 21, 2010; disobeying an order on May 6, 2010; fighting on November 4, 2010; threatening to harm/injure staff and disobeying an order on January 28, 20111; threatening to harm/injure staff and using profane language on May 13, 2011; possessing a weapon on July 21, 2011; unauthorized use of tobacco and having unauthorized funds on December 11, 2011; and disobeying an order on October 25, 2013.  (See Dunston Aff. (DE 44-2) ¶ 26, Exs. E, F).

[11] According to defendants, Volume 31, Issues 25, 27, 28, and 29 were disapproved by defendant Stanback at Scotland C.I.  (See Lassiter Aff. (DE 44-3) ¶ 7, Ex. B).  Defendant Lassiter did not "approve the disapproval." (See id. ¶ 7, Ex. B).  Rather, defendant Stanback's disapproval was upheld by the Publications Review Committee. (See id. ¶ 7, Ex. B).  The basis of the denial and the reason the denial was upheld by the Publications Review Committee was that page 39 contained material that depicted, encouraged, advocated, or instructed "violence against any ethic, racial or religious group or which reasonably appears to like [sic] to provoke or to precipitate a violent confrontation between the recipient or recipients or any other inmate in possession of same a member or members of the target group."  (See id. ¶ 7, Ex. B).
  On May 14, 2012, defendant Lassiter advised the publisher of the disapproval and then waited the requisite 15 days to see if the publisher would request a review.  (See id. ¶ 7, Ex. B).  Because no request for review was received in the allotted time period, on May 30, 2012, defendant Lassiter advised the Facility Head and plaintiff that the Publication Review Committee's decision to uphold the disapproval.  (See id. ¶ 7, Ex. B).

[12] According to defendants, Volume 31, Issues 31, 32, and 33 of "The Final Call" were not banned without review.  (See id. ¶ 8, Ex. C).  Defendants represent that there is no record that plaintiff sought review of the denial of these publications.  (See id. ¶ 8, Ex. C).  According to defendants, Volume 31, Issue 30 of "The Final Call" was not banned without review.  (See id. ¶ 9, Ex. D).

6

can lead to violence and criminal activity within the prison, they are banned in a manner consistent with the Publications Received/Possessed by Inmates Policy ("Publications Policy"). (See id. ¶ 5, Ex. A).

When material is rejected under the Publications Policy, the inmate is informed and given the opportunity to appeal the facility's decision to the Publications Review Committee. (See id. ¶ 6). On appeal, the Publications Review Committee can accept, reject, or modify the facility's decision. (Id.) If the Publications Review Committee modifies or rejects the decision of the facility, it will then notify the publisher and give it 15 days to ask for a review of its decision. (Id.) In the event that no request for review is filed in 15 days, the Publications Review Committee will notify both the facility head and the inmate of the decision and the basis for the decision. (Id.)

On February 5, 2015, plaintiff attempted to assault a correctional officer at Tabor C.I. (See Dunston Aff. (DE 44-2) ¶ 27, Ex. G. As plaintiff was being escorted out of the housing unit, he attempted to head-butt the officer. (See id. ¶ 27, Ex. G). Plaintiff also stated that he was going to "beat Officer Garrell's ass," called Officer Garrell a "Black Devil," and called Sergeant Strickland a "White Devil." (See id. ¶ 27, Ex. G).

Plaintiff contends that there is no religious service or program devoted to NOI prisoners, even though there are programs and chaplaincy services provided for other religions. (See Compl. (DE 1) ¶ 30).

## DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter

of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." <u>Myrick v. Prime Ins. Syndicate, Inc.</u>, 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. <u>Id.</u> at 489-90.

B.    Analysis

1.    Plaintiff's Motion to Amend

In plaintiff's motion to amend, he argues that the object of NOI and Five Percenters is to "straighten out the plan that is confused now about the origin of man." (<u>See</u> Mot. Amend (DE 55) at 2). Plaintiff's motion to amend must be denied as futile because it fails to allege any new facts or argument with legal meaning. <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962) (recognizing that leave to amend should be "freely given when justice so requires" absent some reason like futility of the amendment). Consequently, plaintiff's motion to amend must be denied.

2.    Defendants' Motion to Seal

Defendants seek to seal documents that are prohibited in NCDPS prison facilities based on the security risk created by the racist and hate rhetoric contained therein. (<u>See</u> Mot. Seal (DE 48) at 2). Defendants argue that the exhibits contain materials that would pose a security risk if disclosed to inmates.[13] (<u>Id.</u>)

The court considers defendants' motion under the governing standard and determines that the exhibits should be sealed. <u>See</u> <u>Doe v. Pub. Citizen</u>, 749 F.3d 246, 271-73 (4th Cir. 2014) (setting forth the proper analysis on a motion to seal). In particular, the documents at issue have been

---

[13] Because the materials pose a risk, defendants did not provide plaintiff with a copy of the exhibits.

deemed a threat to institutional security by NCDPS officials and are not permitted to be possessed by inmates. Therefore, defendants' motion to seal is GRANTED. <u>See e.g.</u>, <u>Brown v. Ray</u>, 695 F.Supp. 2d 292, 307-08 (W.D. Va. 2010) (granting motion to seal "Final Call" publication). The clerk is DIRECTED to maintain (DE 47-1) through (DE 47-5) under seal.

2.      Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the basis that there are no genuine issues of material fact and they are entitled to judgment as a matter of law. (<u>See</u> Mot. Summ. J. (DE 41) at 1). Defendants further contend that qualified immunity bars both plaintiff's case and his claim for damages against them. (<u>Id.</u>)

a.      Defendants Adkinson and McPhearson

Defendants argue that defendants Adkinson and McPhearson are entitled to summary judgment because plaintiff has not alleged any facts that would support a claim against them. (<u>See</u> Mem. Supp. (DE 42) at 11). A review of the record reveals that plaintiff has failed to allege <u>any</u> facts against defendants Adkinson and McPhearson. (<u>See</u> Compl. (DE 1)). In fact, the <u>only</u> mention of defendants Adkinson and McPhearson is in the caption and the prayer for relief.[14] (<u>See</u> <u>id.</u> ¶¶ 9, 10, 54). Consequently, defendants Adkinson and McPhearson are entitled to summary judgment in their favor on all of plaintiff's claims against them.

---

[14] Plaintiff's complaint, in pertinent part, provides as follows:

9. Defendant, Crystal Atkinson is a correctional officer of the North Carolina Department of Public Safety, who at all times mentioned in this complaint, held the rank of sergeant and was assigned to Tabor C.I.

10. Defendant James McPherson is a correctional officer of the North Carolina Department of Public Safety who, at all times mentioned in this complaint, held the rank of captain and was assigned to Tabor C.I.

(<u>See</u> Compl. (DE 1) ¶¶ 9, 10).

b.    Defendant Dunston

Defendants next argue that plaintiff's only allegations involving defendant Dunston provide that "[a]round October 2006 Larry Dunston had plaintiff shipped to the Security Threat Group Unit (STGMU) at Foothills C.I."  (See Mem. Supp. (DE 42) at 11-12) (citing Compl. (DE 1) ¶ 17)). Referencing only his own affidavit, defendant Dunston claims that he had nothing to do with plaintiff being enrolled in the STGMU program.  (See id.) (citing Dunston Aff. (DE 44-2) ¶¶ 3, 4, 25).    In  fact,  defendant  Dunston  asserts  that  he  was  not  promoted  to  Assistant Superintendent/Security Specialist, the position he held that was responsible for management of STG members, until September 24, 2007, which was almost a year after plaintiff's enrollment in the program.  (Id.)

Defendants have merely highlighted in their argument that there is an issue of material fact as to Dunston's involvement, which is arguably material.   Therefore, defendant Dunston is not entitled to summary judgment on this basis.

c.    RLUIPA and the First and Fourteenth Amendments

Defendants argue that they did not deny plaintiff any rights secured by the RLUIPA or the First or Fourteenth Amendments to the U.S. Constitution. (See Mem. Supp. (DE 42) at 12-22).  It is not clear to this court if plaintiff's religious beliefs are consistent with being a Five Percenter, NOI, or both.  For example, plaintiff admitted he was a Five Percenter.  (See Dunston Aff. (DE 44-2) Ex. D).  In his complaint, plaintiff states that he is a follower of the religious group NOI.  (See Compl. (DE 1) ¶ 25).  Then, plaintiff requests that Five Percenters be removed from STG status. (Id. ¶ 54).  Finally, as an exhibit to his complaint, plaintiff has filed a proclamation regarding Five Percenters.  (See id. Ex. A).

This court assumes for purposes of the instant analysis that both Five Percenters and NOI are religious groups that are entitled to First Amendment protection.[15] See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 468 (4th Cir. 1999) (assuming the Five Percenters are a religious group that is entitled to First Amendment protection); see also Coward v. Jabe, No. 1:10CV147, 2014 WL 932514, at *4 (E.D. Va. Mar. 10, 2014) ("Because an answer is not necessary to the ultimate decision here, it is enough to join other courts in simply assuming that [Nation of Gods and Earths, which is otherwise known as Five Percenters] constitutes a religion."), dismissed, 647 F. App'x 181 (4th Cir. 2016).  This court now turns to plaintiff's RLUIPA and First Amendment claims.

RLUIPA provides, in pertinent part, that

[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . .  even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."  Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).

Under RLUIPA, a plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion.  See 42 U.S.C. § 2000cc-2(b).  The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system

---

[15] Defendants note that "NCSPA" does not deem Five Percenters to be a religion, and  NCDPS prison facilities do not recognize Five Percenters or NOI as religions.  (See Mem. Supp. (DE 42) at 12).

of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, . . . or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted).

Once the inmate makes a prima facie showing of a RLUIPA violation, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Ozmint, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting Lovelace, 472 F.3d at 198 n.8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted); Ozmint, 578 F.3d at 252 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.'. . . Rather due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" Couch, 679 F.3d at 201 (quoting Lovelace, 472 F.3d at 190); see Holt v. Hobbs, 135 S. Ct. 853, 866 (2015).

As for the First Amendment, the Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion[.]" U.S. Const. amend. I. The United States Supreme Court has applied the First Amendment to the states through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). To state a free exercise claim

under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

In deciding whether a defendant's actions can be sustained as "reasonably related to legitimate penological interests," the court must consider the following four factors: 1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; 2) whether there are alternative means of exercising the right in question that remain open to prisoners; 3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation or prison resources; and 4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89-90. Claims pursuant to the First Amendment and RLUIPA are evaluated under the same factors, but First Amendment claims are subject to a less demanding standard of proof. See Lovelace, 472 F.3d at 198 n.8 ("RLUIPA adopts a 'more searching standard' of review than that used for parallel First Amendment claims, strict scrutiny instead of reasonableness.") (quoting Madison v. Riter, 355 F.3d 310, 314-15 n.1 (4th Cir. 2003)).

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; accord Meachum v. Fano, 427 U.S. 215, 223 (1976). In order to determine whether a due process violation has occurred, an initial determination must be made that a protected liberty interest exists

and, if so, the next step is to define what process is mandated to protect it. See Sandin v. Conner, 515 U.S. 472, 484 (1995). In order to demonstrate a liberty interest meriting procedural due process protections, an inmate must show: "(1) denial of an interest that can arise either from the Constitution itself or from state laws or policies," and (2) "this denial imposed on him an atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Prieto v. Clarke, 780 F.3d 245, 251 (4th Cir. 2015) (internal quotations omitted).

As addressed below, defendants are entitled to summary judgment on plaintiff's claims under RLUIPA and the First and Fourteenth Amendments to the U.S. Constitution.

### i. Prohibition on Five Percenters and NOI

In prisons in North Carolina and other states, Five Percenters have been designated as a STG. (See Dunston Aff. (DE 44-2) ¶ 14). Similarly, the Federal Bureau of Investigations has determined that Five Percenters is a pervasive gang throughout the United States. (See Brown Aff. (DE 44-4) ¶ 12). Finally, the Five Percenters are thought to be banned both in the Federal Bureau of Prisons and the prison systems of many states. (Id.)

Defedant Dunston possesses over 1,200 hours of training related to STGs and more than 15 years of experience managing STG members in North Carolina prisons. (See Dunston Aff. (DE 44-2) ¶ 4). According to defendant Dunston, Five Percenters are a radically racist group that employs violence to support their views. (Id. ¶ 15). Moreover, Five Percenters' literature is inflammatory in a manner, which could lead to a dangerous and volatile atmosphere within the walls of a prison where racial rhetoric jeopardizes safety and security. (Id.; Lassiter Aff. (DE 44-3) ¶ 11). Defendant Dunston is familiar with the rhetoric associated with Five Percenters, and he has seen the violence it causes in North Carolina prisons. (See Dunston Aff. (DE 44-2) ¶ 16) Defendant Dunston has

reviewed documentation revealing the imminent threat of Five Percenters to the security of prisons. (Id.) In particular, defendant Dunston is aware of Five Percenters' involvement in extortion; contraband; aggressive violence, including attacks on both inmates and correctional officials; militant and hostile behaviors; and the drug trade. (Id. ¶¶ 15, 26, 27, Ex. G).

Betty Brown, the Director of Chaplaincy Services, explains that NOI is historically based on racist beliefs. (See Brown Aff. (DE 44-4) at ¶ 4, 22). In fact, the "Black" man is thought to be superior to all other races, and the "White" man is a devil that enslaves the "Black" race. (Id. ¶ 22).

The Fourth Circuit Court of Appeals has recognized the connection between Five Percenters and NOI. See In re Five Percenters, 174 F.3d at 466 (making reference to "the Five Percent Nation of Islam"). NOI, like Five Percenters, holds anti-Semitic beliefs. (See Article (DE 44-1) Ex. A).


Promoting the safety of inmates is deemed a "legitimate concern." Jehnovah v. Clarke, 798 F.3d 169, 178 (4th Cir. 2015). Moreover, the safety of inmates in a prison setting is a "compelling governmental interest." McRae v. Johnson, 261 F. App'x 554, 558 (4th Cir. 2008) (citing Cutter, 544 U.S. 722 ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety.")

In this case, defendants have shown that the prohibition on Five Percenters and NOI furthers a compelling governmental interest, which is the safety of inmates. Moreover, defendants have shown no lesser alternative to accomplish such interest. Therefore, defendants' prohibition on Five Percenters and NOI complies with the requirements of RLUIPA.

This court need not conduct a separate analysis under the First Amendment because RLUIPA requires a higher degree of proof than the First Amendment standard. See Lovelace, 472 F.3d at 198

n.8 (". . . RLUIPA adopts a more searching standard of review than that used for parallel First Amendment claims, strict scrutiny instead of reasonableness.") (quotation omitted).

### ii.    Designation of Five Percenters as STG

Five Percenters' history of violence and gang-related behavior is well-documented.  See In re Five Percenters, 174 F.3d at 467 (recognizing that (1) a federal intelligence summary "called the Five Percenters a 'radical Islamic sect/criminal group' that 'is often boldly racist in its views, prolific in its criminal activities, and operates behind a facade of cultural and religious rhetoric;" and (2) a New Jersey intelligence report described "the Five Percenters as 'a group of individuals who espouse violence as a means to an end'"); see also Self-Allah v. Annucci, No. 97-CV-607(H), 1999 WL 299310, at *9 (W.D.N.Y. Mar. 25, 1999) (referring to the "substantial history of violence associated with Five Percenter activities").

Given the security concerns associated with Five Percenters, NCDPS's designation of Five Percenters as a STG is the least restrictive means of serving the compelling state interest of inmate safety.   Plaintiff's claim that NCDPS's designation of Five Percenters as a STG imposes a substantial burden on his ability to exercise his religion in violation of both RLUIPA and the First Amendment, as well as his request for declaratory and injunctive relief related thereto, must fail.

### iii.    Plaintiff's designation as a STG member

Plaintiff seeks a declaration that NCDPS should not designate him as a member of a STG. (See Compl. (DE 1) ¶ 53).  It is not clear whether this claim is based on religious freedom or due process.

NCDPS has an extensive process that it follows to determine if an inmate is the member of a STG.  (See Dunston (DE 44-2) ¶ 6).  As applied in this case, plaintiff was initially designated as

a Level III STG member based, in part, on his own admission that he was a Five Percenter.  (Id.)

Plaintiff completed the STGMU course, and he was reduced to Level II.  (See Compl. (DE 1) ¶ 23).

Under the NCDPS process, plaintiff could have been reduced to Level I and then fully removed as

a STG member, but he did not continue to distance himself from gang-like activity.  (Id. ¶ 26).  In

particular, plaintiff accumulated 83 infractions, which included violence directed toward both staff

and other inmates, and possession of weapons, contraband, and unauthorized funds.[16]  (Id. ¶ 28).

If plaintiff's claim is based on religious freedom under the First Amendment, the matter of

the designation of Five Percenters as a STG under RLUIPA and the First Amendment have been

addressed.  See supra 16.  To the extent plaintiff's claim is based on a violation of his rights to due

process, his claim must fail because even if plaintiff could prove a deprivation of "life, liberty or due

process of law" under the Fourteenth Amendment there is an adequate state post-deprivation remedy

to address it.  In particular, inmates are given regular reviews of their validation status, and they may

also request a review.  (See Dunston Aff. (DE 44-2) ¶ 8).  Moreover, in this case, plaintiff's

continued designation as a STG member was based on his own actions, not any action by

defendants.

    iv. Prohibition of The Supreme Wisdom Lessons and "The Final Call"

In Allah v. Virginia, 601 F. App'x 201 (4th Cir. 2015), the Fourth Circuit Court of Appeals

addressed restrictions imposed on Five Percenters in light of the requirements of RLUIPA.  The

Court found no error in the district court's opinion, which held that the prison's decision to ban Five

Percenters' typed and handwritten materials was "the least restrictive means of furthering a

---

[16] There is a connection between a high rate of prison infractions and ongoing participation in a STG.  (See Dunston Aff. (DE 44-2) ¶ 28).

compelling interest in prison safety." Id. at 205. The same rationale applies to the instant case.

To the extent that plaintiff is arguing that the prohibition of The Supreme Wisdom Lessons and "The Final Call" constitute a "taking" of property without due process in violation of the Fourteenth Amendment, this too fails. Even when a plaintiff "has been deprived of property under color of state law," there is no due process violation when a post-deprivation remedy is available Parratt v. Taylor, 451 U.S. 527, 543-44 (1981) (quotation omitted), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 328(1986). The holding in Parratt has been extended to intentional deprivations of property. See Hudson v. Palmer, 468 U.S. 517, 533 (1984).

Plaintiff has failed to allege or show that no post-deprivation remedy existed. Moreover, as noted above, when material is rejected by NCDPS under the Publications Policy, the inmate is informed and given the opportunity to appeal the decision to the Publications Review Committee. (See Lassiter Aff. (DE 44-3) ¶ 6).

v.      Private practice of his beliefs

Plaintiff does not allege that he is prohibited from practicing his religious beliefs in the privacy of his cell. (See Compl. (DE 1)). Similarly, defendants represent that plaintiff can practice his religious beliefs, whatever they may be, in the privacy of his cell. (See Brown Aff. (DE 44-4) ¶ 8, Ex. A). Plaintiff is also permitted to practice generic Islam in accordance with that faith's recognized practices. (See id. ¶ 21)

In this case, the failure to provide a separate service for NOI does not violate the First Amendment. See Harbin v. South Carolina Dep't of Corrs., No. 6:13-cv-01973-JMC, 2014 WL 4955200, at * 11 (D.S.C. Sept. 30, 2014) (finding no violation where a NOI service known as Jumu'ah was not provided), afff'd, 605 F. App'x 224 (4th Cir. 2015); Allen v. South Carolina Dep't

of Corr., No.. 3:10-939-HMH-JRM, 2012 WL 1655297, at *1 (D.S.C. April 24, 2012) (concluding that RLUIPA did not require that prison offer separate NOI services). The analysis is equally applicable in the context of Five Percenters.

### vi. Requisite intent under RLUIPA

Defendants argue that plaintiff has failed to establish that they acted with the requisite intent to support a RLUIPA claim. (See Mem. Supp. (DE 42) at 22). In particular, defendants argue that there is absolutely no evidence that they "intentionally" violated plaintiff's rights in any way. (Id.)

To state a RLUIPA claim against an individual, a plaintiff must show that defendant acted with the requisite intent. Lovelace, 472 F.3d at 194-95. Such a claim requires more than mere negligence and is satisfied only by intentional conduct. Id. at 194 ("We conclude that simple negligence, the lowest common denominator of customary tort liability, does not suffice to meet the fault requirement . . . of RLUIPA.") (internal quotation marks omitted).

There is no evidence before this court suggesting that the individual defendants acted "intentionally" to violate plaintiff's rights. In fact, as outlined above, there has been no violation of plaintiff's rights under RLUIPA.

### d. North Carolina Constitutional rights

Next, defendants next argue that they did not deny plaintiff any right secured by Article I, §§ 13, 14 of the North Carolina Constitution. (See Mem. Supp. (DE 42) at 22-24). The North Carolina Constitution, Article I, § 13 provides that "[a]ll persons have a natural and inalienable right to worship Almighty God according to the dictates of their own conscience, and no human authority shall, in any case whatever, control or interfere with the rights of conscience." The religious freedoms protected by § 13 are consistent with those protected by federal law. See In re Williams,

269 N.C. 68, 78 (1967) (noting that "the freedom protected by this provision of the State Constitution is no more extensive than the freedom to exercise one's religion, which is protected by the First Amendment to the Constitution of the United States).

The North Carolina Constitution, Article I, § 14 provides that "[f]reedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be responsible for their abuse." The North Carolina Constitution allows a direct cause of action against both the state and state officials acting in their official capacity for violations of § 14's free speech guarantee. Corum v. Univ. of N. Carolina, 330 N.C. 761, 785-88 (1992).

As addressed above, the restrictions imposed by NCDPS on plaintiff's right to the free exercise of his beliefs, as either a Five Percenter or NOI, do not violate RLUIPA. Likewise, NCDPS's restriction on openly discussing the racist rhetoric of the Five Percenters and NOI or receiving the racist publications is consistent with the legitimate penological interest in maintaining safety and security in North Carolina prisons. Because plaintiff has failed to raise a genuine issue of material fact on the issue of whether his rights under the North Carolina Constitution were violated, defendants are entitled to summary judgment. Consequently, plaintiff's claims under the North Carolina Constitution must be dismissed.

e.      Official Capacity Claims

Defendants next argue that plaintiff's claim for monetary damages against them in their official capacities is barred by the doctrine of sovereign immunity. (See Mem. Supp. (DE 42) at 24-25). The Eleventh Amendment prevents a lawsuit in federal court against a State without its consent. U.S. Const. amend XI; Alden v. Maine, 527 U.S. 706, 729 (1999). By the same token, a state officer acting in their official capacity is entitled to Eleventh Amendment immunity. Will v.

Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

In this case, a suit against defendants in their official capacities is a suit against North Carolina. There has been no representation that defendants have waived their immunity or otherwise consented to this lawsuit. Therefore, defendants are entitled to summary judgment on plaintiff's claims for relief seeking monetary damages against them in their official capacities under § 1983.

      f.      Qualified Immunity

Finally, defendants argue that plaintiff's claim for monetary damages against them in their individual capacities is barred by the doctrine of qualified immunity. (See Mem. Law (DE 42) at 25-26). Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232 (2009).

In this case, plaintiff has presented no evidence that defendants violated clearly established statutory or constitutional rights that a reasonable person would have been aware of. As a result, qualified immunity shields defendants from plaintiff's claim for money damages against them in their individual capacities. Defendants are entitled to summary judgment on plaintiff's claims for money damages against them in their individual capacities.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (DE 41) and

defendants' motion to seal (DE 48) are GRANTED.  Plaintiff's motion to amend (DE 55) is

DENIED.  The clerk is DIRECTED to close this case.

SO ORDERED, this the 25th day of September, 2017.


LOUISE W. FLANAGAN
United States District Judge